---

JAMES D. GREEN,

        Plaintiff,

        v.                             Case No. 25-cv-0532-bhl

DR. SARA ENGLISH,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff James Green, an inmate at Green Bay Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on an Eighth Amendment medical care claim based on allegations that Defendant Dr. Sara English was deliberately indifferent to his complaints of severe wrist pain. On February 4, 2026, Dr. English filed a motion for summary judgment. For the reasons explained below, the Court will grant the motion and dismiss this case.

## BACKGROUND

At the relevant time, Green was incarcerated at the Waupun Correctional Institution. Dr. English worked as a physician at the Dodge Correctional Institution, but at the relevant time she also provided coverage at Waupun on Wednesdays and Fridays due to a staffing shortage. Dr. English's first interaction with Green was on November 25, 2023, when Green submitted a health services request complaining that his hand was in excruciating pain from nerve damage and that the prescribed medication was not working. Dr. English responded to the request on November 29, 2023, and informed Green that she would increase the medication's dosage. She also noted that, after reviewing his charts, it did not appear that anything they had done had helped his symptoms. She asked him for his input on whether any previous treatment had helped. Green did not respond. He asserts that he did not want to be accused of medication shopping. Dkt. Nos. 18, 25 at ¶¶1-3, 24-26.

On December 26, 2023, Green submitted a health services request stating that he was still waiting to see his provider. Nurse Ann York triaged the request that same day and noted that

Green was scheduled to be seen by his provider. Dr. English never received this request. Dkt. No. 18 at ¶¶55-58; Dkt. No. 21-1 at 341.

About a week later, on January 5, 2024, Green submitted another health services request stating that his nerve pain was getting overbearing and he needed help with his wrist. He again stated that the prescribed medication was not working. Dr. English responded on January 10, 2024, informing him that he would need to get a new EMG to assess his nerve condition and to compare to the previous EMG, which had been taken in 2019. She also recommended that he start taking another anti-inflammatory and asked him if he had a preference. That same day, Dr. English referred Green for an offsite neurological appointment for an EMG. Dkt. Nos. 18, 25 at ¶¶27-31.

On January 17, 2024, Green submitted a health services request stating that his hand was causing him excruciating pain. Nurse Ann York triaged the request that same day and noted that Green was scheduled to be seen by his provider. Dr. English never received this request. Dkt. No. 18 at ¶¶59-61; Dkt. No. 21-1 at 337.

The EMG was performed on January 25, 2024. The findings did not show much difference from the 2019 EMG, so Dr. English believed no change to Green's plan of care was warranted. Dr. English wrote to Green on February 2, 2024, to let him know that he had mild neuropathy in both wrists. She noted that the results did not change his current plan of care and that anti-inflammatories such as ibuprofen, Tylenol, and Naproxen would be the first line of treatment. She informed him that anti-inflammatories were available in the canteen. At that time, thirty tablets of ibuprofen cost $1.76 and fifty tablets of acetaminophen cost $3.00. Dkt. Nos. 18, 25 at ¶¶32-45.

Green explains that after his first EMG in 2019, he was prescribed Gabapentin, which was effective to treat his pain. Green explains, however, that he stopped taking Gabapentin sometime in 2020 after he got sick with COVID. His prescription was then canceled in November 2020 because testing revealed that the Gabapentin levels in his blood were undetectable. Dr. English explains a lack of Gabapentin in one's system signals to the provider misuse or diversion of the medication. Green explains that the levels in his system were low because he had stopped taking the medication while he was sick, but he provides no evidence regarding when he contracted COVID, how long he stopped taking the medication, or whether at the time he was tested in November 2020, he explained to his provider why the Gabapentin levels were undetectable. It is undisputed that Green never suggested Gabapentin as an option to treat his pain, even after Dr.

2

English asked him to provide information about medications that had helped him in the past. Dkt. Nos. 18, 25 at ¶¶43, 106-109.

On February 5, March 9, March 27, March 31, May 16, and June 6, 2024, Green submitted health services requests about his wrist pain. Nurses triaged and responded to these requests. Dr. English did not receive any of them. On June 10, 2024, Green submitted an information request to the health services manager about his persistent complaints of wrist pain. He explained that he had repeatedly requested to see Dr. English, but she had not seen him. A nurse triaged the response and sent Dr. English a message explaining that Green had a provider appointment scheduled for May 22, 2024, but, for unexplained reasons, he was not seen. She noted that there was a referral in place for a future appointment with a provider and she asked whether the referral could be scheduled. Dr. English responded that same day that she was under the impression that if a scheduled examination did not happen, the examination would be rescheduled automatically. Dkt. No. 18 at ¶¶46-48; 62-79.

On July 9, 2024, Green submitted another information request directed to the health services manager explaining that he was in excruciating pain and had been waiting for months to see Dr. English. Two days later, Green was informed that he would be seen by an advance nurse practitioner prescriber (APNP). At the appointment on August 1, 2024, the APNP found that Green had normal range of motion in both wrists with no sign of swelling or edema. She ordered ibuprofen and acetaminophen, lidocaine topical, and to continue range of motion exercises. Green stopped taking his medication while he was on a hunger strike to protest his assignment to the restricted housing unit. But on October 5, 2024, a few weeks after he restarted the medications, he submitted a health services request stating that they were not effective to treat his pain. Dkt. No. 18 at ¶¶80-101.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party

3

opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Green asserts that Dr. English violated the Eighth Amendment when she was deliberately indifferent to his persistent complaints of excruciating wrist pain. "[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc*., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Id*. (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016)).

The summary judgment record supports a jury issue on the first element of Green's claim but not the second. In other words, while a jury could reasonably conclude that Green suffered from an objectively serious medical condition, it could not reasonably conclude that Dr. English was deliberately indifferent to that condition. Dr. English worked at the institution where Green was housed only two days per week. She first learned of Green's complaints in late November 2023, at which time she promptly increased the dosage of his prescribed medication. She also reviewed his chart and, after noting his persistent complaints, asked for his input on what prior treatments had been effective. Green chose not to respond. About a month later, on January 10, 2024, after receiving a second health services request, Dr. English promptly ordered an EMG to compare the results to the EMG performed in 2019. She suggested he start taking an anti-inflammatory in the meantime and asked him if he had a preference. He again chose not to respond. Finally, on February 2, 2024, after reviewing the EMG results, Dr. English informed Green that there had been little change since 2019, so he should continue with the anti-

4

inflammatories, which he could purchase in the canteen.  As far as Dr. English knew, this advice settled the matter because she did not receive any more health services requests from Green.  Based on the foregoing, no jury could reasonably conclude that her prompt responses and actions, to which Green failed to respond despite her invitations to do so, demonstrated that she was deliberately indifferent to his complaints of pain.

Green asserts that Dr. English should have examined him in person, but he does not explain how an in-person examination would have impacted her treatment decisions.  Indeed, nurses performed in-person examinations and noted that Green had full range of motion in his wrists with no swelling or edema, but Green asserts that such observations were meaningless because his pain was internal with no external or observable symptoms.  *See* Dkt. No. 25 at 50.  Dr. English, who had an extremely limited schedule, invited Green to provide her with additional information in writing rather than in person, but Green disregarded those invitations.  Green may have preferred to speak with Dr. English in person, but he "is not entitled to demand specific care," nor is he "entitled to the best care possible; he is entitled to reasonable measures to meet a substantial risk of serious harm" to him, and Dr. English took those measures.  *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Green also highlights that he submitted numerous health services requests after the EMG, complaining that he was in a lot of pain and that he was unable to purchase anti-inflammatories at the canteen.  Green was understandably frustrated by the responses he received to his persistent complaints, but Dr. English was not personally responsible for those responses.  Dr. English explains under penalty of perjury that none of the health services requests that Green submitted after she reported his EMG results were routed to her for response.  Instead, nurses triaged and responded to those health services requests.  As previously noted, as far as Dr. English knew, Green had found relief by purchasing anti-inflammatories at the canteen as she had suggested after his EMG.  She could not have been deliberately indifferent to pain she did not know Green was experiencing.  *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (holding that a defendant is liable for damages under §1983 only if she was personally responsible for the deprivation of a constitutional right, meaning that the deprivation occurred at the defendant's behest or with her knowledge and consent).

Moreover, Green was not harmed by Dr. English's decision to inform him that he could purchase anti-inflammatories as needed at the canteen rather than prescribing them because

medical records show that, after they were prescribed by the APNP, Green did not take them regularly and when he did, he stated that they were ineffective. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) ("In order to succeed in a § 1983 suit, a plaintiff must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages."). Finally, Dr. English explained why she did not believe medication other than anti-inflammatories was warranted, at least not as a starting point. Green did not provide her with any guidance regarding what prior treatments were effective, and it appears that he did not consistently take the medications that were prescribed to him. Green may have preferred a different course of treatment, but a "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Dr. English is therefore entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment (Dkt. No. 16) is **GRANTED** and this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of April, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final.  Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment.  *See* Fed. R. App. P. 3, 4.  This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline.  *See* Fed. R. App. P. 4(a)(5)(A).  If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome.  If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court.  *See* Fed. R. App. P. 24(a)(1).  Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious.  *See* 28 U.S.C. §1915(g).  If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury.  *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b).  Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment.  Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment.  The Court cannot extend these deadlines.  *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.